668 So.2d 1221 (1996)
Richard WOOLEY
v.
E.J.D. BUILDERS, INC.
No. 94-CA-955.
Court of Appeal of Louisiana, Fifth Circuit.
January 30, 1996.
Writ Denied April 8, 1996.
*1223 J. Douglas Sunseri, Nicaud & Sunseri, Metairie, for Defendant/Appellant.
James E. Vinturella, Lewis & Caplan, New Orleans, for Claimant/Appellee.
Before WICKER, GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
Defendant, E.J.D. Builders Inc. (E.J.D.), appeals two adverse judgments of the Office of Worker's Compensation. We affirm.
Claimant, Richard Wooley, filed a disputed claim for Worker's Compensation on June 2, 1992. After a hearing on the merits of the claim held on December 9 and 10, 1993, the trial court took the matter under advisement. On March 31, 1994 the court rendered judgment, ruling that the claimant was a statutory employee of E.J.D. who was injured in the course and scope of that employment. The judgment awards payment of temporary total disability benefits from April 10, 1992 at the rate of $10.00 per hour for an average work week of thirty-seven hours per week. The judgment also awards medical expenses and damages for arbitrary and capricious behavior on the part of defendant in the amount of $2,000.00, and attorney's fees in the amount of $3,500.00. Comprehensive reasons for judgment accompanied the judgment.
On April 11, 1994, defendant filed a Motion for New Trial based on newly discovered evidence and/or Motion to Disqualify Claimant from Worker's Compensation Benefits pursuant to LSA-R.S. 23:1208. The court set the matter for an evidentiary hearing on August 5, 1994. On April 15, 1994 the defendant moved for an evidentiary hearing on the motion for new trial. In response to that motion, the court rescinded the order setting the hearing for August 5, 1994 and reset the matter for June 6, 1994.
On May 24, 1994 the defendant filed a petition for appeal of the March 31, 1994 judgment. The court rendered a judgment dated August 30, 1994 denying both the Motion for New Trial and the Motion to Disqualify Claimant from Workers' Compensation Benefits. That judgment is also accompanied by reasons for judgment. Defendant filed a second petition for appeal.
The issues presented for review by the defendant are:
1. Whether there exists a causal connection between claimant's injury and the work-related incident.
2. Whether the disability was sufficient to preclude the claimant from immediately returning to work.
3. Whether the hearing officer used the correct formula in calculating the rate of compensation.
4. Whether the defendant was arbitrary and capricious in failing to pay compensation benefits and medical expenses.
5. Whether a new trial should have been granted.
6. Whether the claimant should have been disqualified from entitlement to compensation for fraud pursuant to LSA-R.S. 23:1208.
*1224 The record shows that the claimant, Richard Wooley, is a forty-year-old man with an eighth grade education who has done manual labor all of his life. At the hearing on the merits Mr. Wooley testified that he started work with E.J.D. in January 1991 doing general carpentry work. E.J.D. is a contracting company which does mostly interior construction in commercial spaces. Mr. Wooley did manual labor, framing walls, putting up sheetrock, ceiling grids and tiles, and hanging doors, for which he earned $10.00 per hour.
On the day the incident occurred, Mr. Wooley was "shooting" metal tract into steel beams in a small, confined area in the attic space of the office building in which he was working. In order to accomplish that task, Mr. Wooley was using a stud gun. After about three or four shots his ears began to ring and he was unable to hear his co-worker who was giving him the necessary measurements to complete the work. Mr. Wooley stated that he stopped working and waited for the ringing in his ears to stop and his hearing to return. Subsequently, he retrieved his tools and went to the office to report the problem. Mr. Wooley testified that the accident happened on a Friday. According to the record the date was April 10, 1992. On the Monday after the accident, Mr. Wooley's hearing still had not returned and the ringing in his ears continued. Consequently, his wife called the office to explain the problem and to ascertain if the company would recommend a doctor. Because the company offered no recommendation, on the advice of a friend, Mr. Wooley consulted Dr. Robert Owens. Dr. Owens informed the claimant that he had a 75 to 80% hearing loss and could not be exposed to loud noises. Dr. Owens further advised Mr. Wooley that he would have to wear earplugs or earmuffs when doing any kind of construction job because of the hammering, drilling and sawing noises to which he would be exposed.
Since the accident Mr. Wooley has been unable to secure a job as a construction worker, although he has applied for several. Additionally, he tried to get a job as a cashier in a service station near his home in Picayune but was turned down because of his hearing impairment. He was able to find gainful employment with James Alsobrooks, a contractor for whom Mr. Wooley had worked in the past; however, since he could not hear measurements being called out to him while he was on the roof cutting rafters, he was unable to function as a carpenter. Further, because of his hearing impairment, Mr. Wooley would not be safe on a construction job since a worker must be aware of large equipment operating in the area. Mr. Wooley said that he wanted rehabilitation or training and hearing aids so that he could return to gainful employment. He denied having any hearing impairment before the accident.
On the issue of employment status Mr. Wooley testified that he did not have a contract with E.J.D. and did not bid on a job. He considered himself a full time employee of E.J.D., averaging 45 to 50 hours per week on the job. However, during parts of 1991 and 1992, because of family emergencies, he missed work often and did not average a 40 hour work week. Mr. Wooley explained that his father, who lived about 85 miles northeast of Birmingham Alabama, had open heart surgery in 1991. During the time of his father's illness, Mr. Wooley made several trips to Alabama. His father's condition became critical around Christmas time in 1991. Also, in 1992, Mr. Wooley's sister was confined to Tulane Medical Center after a kidney transplant which was ultimately unsuccessful. Mr. Wooley explained that he spent much of his time during this period traveling between New Orleans and Birmingham tending to his critically ill father and sister.
Mr. Wooley testified that at some point in mid-1991 he was laid off from his job with E.J.D. He found temporary employment with a local contractor who was building a jewelry store in Shreveport, but returned to his job with E.J.D. as soon as it was available again. Throughout his employment with E.J.D. he used tools and scaffolding which were supplied to him by E.J.D. However, when necessary he would use his own personal tools and equipment.
He explained that, while he occasionally recommended workers to E.J.D., he never hired anyone. The workers were hired by *1225 E.J.D. He denied bringing his own crew to work for E.J.D., or having employees. He explained that, because he lives in Picayune, Mississippi, he often commutes to work with several other workers to share the cost of transportation. He testified that the last job he completed as a subcontractor was in 1990 in South Carolina.
Mr. Wooley also testified that E.J.D. gave him a $220.00 bonus in July of 1991 after completion of a profitable job, a Christmas bonus of $300.00 or $400.00, and a $400.00 vacation check in March, 1992.
The claimant also presented testimony from James Alsobrooks, a representative of Mirmon Construction Company of Slidell, Louisiana, a company which frames houses in the area. Mr. Alsobrooks testified that he has known the claimant for about 20 years in a work setting. He has never known Mr. Wooley to have hearing problems. After the accident Mr. Alsobrooks tried to put Mr. Wooley to work, but was forced to fire him after a short time because Mr. Wooley's hearing impairment made it impossible for them to communicate. Mr. Alsobrooks explained that Mr. Wooley was hired as a "saw man", a job which required that Mr. Wooley stay on the roof and cut rafters to measurements called up to him by a co-worker from the ground. Mr. Alsobrooks stated that he was on the job for several days and observed Mr. Wooley at work. Because of Mr. Wooley's hearing impairment, it was necessary for the measurements to be in writing, necessitating climbing up and down the ladder often. Such a procedure slowed the construction progress and presented additional safety concerns.
Claire Wooley, the claimant's wife of eighteen years, also testified. She stated that her husband had no problem with his hearing before the 1992 accident; however, since that time she has had difficulty communicating with him. She must speak loudly in normal conversations and repeat herself often. Mr. Wooley's hearing impairment has required an investment in special equipment to assist with telephone communication.
Mrs. Wooley testified that she called her husband's employer on April 14, 1992, the Monday after the accident, and apprised Ms. Joyce David of the details of the accident and the injury her husband sustained the previous Friday. Ms. David told Mrs. Wooley to make an appointment with a doctor and send the company the bill.
Ms. Joyce David testified that she is the office manager of E.J.D. She verified that Richard Wooley was paid by the hour at a rate of $10.00. She stated that Mr. Wooley would routinely come to the office or call to get his job assignment for the day. Ms. David explained that Mr. Wooley was a "very smart guy" who did "wonderful work", making it necessary only to tell him on which construction site he was needed. He was able to know at that point what work was necessary. Ms. David described Mr. Wooley as a professional to whom one could merely give a blueprint and trust that the work would be done correctly.
Ms. David testified that she was aware of Mr. Wooley's problems with family illnesses from January through April of 1992. E.J.D. records showed that Mr. Wooley did not work as much in April as he did in January and February. Ms. David attributed that, in part, to his sister's death, but also stated that Mr. Wooley requested a week off to make an unsuccessful bid on a shopping center project. According to Ms. David, Mr. Wooley primarily did subcontracting work and only came into E.J.D.'s offices looking for work when he was between contracts. Ms. David acknowledged that she gave Mr. Wooley a check for $400.00 in March, 1992, but denied that it was a vacation check. Ms. David testified that Mr. Wooley came into the office and asked if he was entitled to a paid vacation since he had worked for the company for a year. Ms. David stated that her husband, the owner of E.J.D., agreed to give Mr. Wooley a check for one week's wages because he was a good worker having a difficult time with his sister's death, and the company had recently completed an especially profitable job. However, she made it clear to Mr. Wooley at the time that he was considered a subcontractor and was not entitled to vacation pay. Ms. David classified the check as a "bonus".
*1226 Ms. David testified that Mr. Wooley was a professional who had his own tools and brought his own crew. However, she admitted she would not know if he actually used any of the company's tools. Ms. David defined an employee as a worker from whose wages taxes were withheld, and for whom income was reported to the IRS on W-2 forms. Income reported on a subcontractor was done on a 1099 form. Mr. Wooley's income was reported on 1099 forms for the two years he worked for E.J.D. Those forms show earnings of $18,000.00 in 1991 and $4,000.00 in 1992 for Mr. Wooley. Although Mr. Wooley averaged only a few hours each week in the weeks immediately preceding the accident, from April, 1991 through February, 1992 he worked full time.
Ms. David stated that she was out of town on the day the accident occurred. She learned of the accident on Monday when Mrs. Wooley called the office to report her husband's absence.
E.J. David, president of E.J.D., testified that Mr. Wooley worked for the company as a construction worker at the rate of $10.00 per hour. Mr. Wooley never bid on a job. He was always paid a flat hourly rate and was never paid by the job. Mr. David said there was no written contract between him and Mr. Wooley defining their business relationship. Mr. Wooley came to the office daily to get his job assignments and often brought his own workers with him to a job. Although Mr. David had the authority to give Mr. Wooley specific instructions on how to complete a job, it was not often necessary because Mr. Wooley knew his profession. Mr. Wooley worked with the company tools as well as his own. According to Mr. David, during the time Mr. Wooley worked for E.J.D. he also worked for himself doing other subcontracting jobs.
He acknowledged that Mr. Wooley was given a $400.00 bonus when he missed a week of work in March, 1992 due to the death of his sister. He denied the money was paid as a vacation check. He contends the money was given to Mr. Wooley as a kindness since he was aware of family illnesses and financial difficulties Mr. Wooley was experiencing at the time. Mr. David knew of the depth of Mr. Wooley's financial problems because Mr. Wooley offered some of his tools to Mr. David for sale shortly before the request for a vacation check. However, Mr. David admitted that no other subcontractors received a bonus.
Mr. David testified he learned of the accident shortly after it occurred, but he could not be sure who informed him of the incident. He stated that the noise level on a construction site is unusually high and over the 37 years he has been working in the business it has affected his hearing adversely.
Emery Byrd, a construction supervisor for E.J.D., also testified. He said Mr. Wooley often came in to work in the same truck with several other workers and they worked together. However, Mr. Byrd was not aware of the financial arraignments between the company and Mr. Wooley or between Mr. Wooley and the men with whom he worked. He could not be sure if Mr. Wooley was paid by the hour or the job because his relationship with the claimant was "pretty spotty". Mr. Wooley received his assignments from Mr. David, not Mr. Byrd. The accident was not reported to Mr. Byrd. He learned of it the next day from the painting supervisor.
Susan Mack, a claims adjustor who handled Mr. Wooley's claim for worker's compensation, testified the claim was denied because there was nothing to indicate the injury was caused by a work-related accident. However, the insurance company did pay $195.00 in medicals to Slidell Ear, Nose and Throat Clinic.
Warren Chatellier, a co-worker and friend of the claimant for about thirty years, testified for the defense. He said Mr. Wooley began experiencing hearing problems about one year before the incident at E.J.D. He based that conclusion on the fact that Mr. Wooley would occasionally make the comment, "I'm deaf in one ear and can't hear out of the other". However, Mr. Chatelier testified that he was not aware of any evaluation or treatment Mr. Wooley had for his hearing impairment.
Ola Mae Carter, who met Mr. Wooley in 1992 when he was employed with E.J.D., also testified for the defense. She stated that she *1227 socialized with Mr. Wooley and knew him to have a hearing problem even before the incident in question. On cross-examination Ms. Carter admitted that she was a close friend of the Davids and lived in a home that they owned. She also acknowledged that she was unaware of any medical reports showing that Mr. Wooley had a hearing problem. Further, Mr. Wooley never told her personally that he had a hearing problem.
The court also heard testimony from Melvin Edwards, a carpenter employed by E.J.D. Mr. Edwards stated that he was a co-worker of Mr. Wooley. On the day of the incident, Mr. Wooley told Mr. Edwards that he was not happy about having to do the job assigned to him that day because it was a difficult one. About one hour later Mr. Edwards returned to find Mr. Wooley packing up his tools and preparing to leave. Mr. Wooley explained that he had injured his ear. Mr. Edwards could not be sure if Mr. Wooley had a previous hearing problem because the two men had not worked together much before.
Also contained in the record is the deposition of John Minica, a co-worker of Wooley since 1990. Mr. Minica testified that he was working with Mr. Wooley on the day of the accident. Mr. Minica stated that the claimant was standing on the top of a ladder in the ceiling using a pneumatic air nailer to shoot metal tract into a steel beam. He came down from the ladder and remarked that his ears were ringing and he was in pain. Mr. Minica estimated the sound of the gun Wooley was using to be as loud as a ".22 or a .32 caliber blank". The two men left work early that day because of Wooley's condition. Mr. Minica stated that he never knew Mr. Wooley to have a hearing problem before this incident.
In six assignments of error briefed to this Court, the defendant challenges the hearing officer's finding that the claimant was a full-time employee who was disabled as a result of a work-related incident. Defendant further challenges the denial of the motion for new trial.
A claimant is entitled to worker's compensation benefits if he receives a personal injury caused by an accident arising out of and in the course of his employment. LSA-R.S. 23:1031. Accident is defined in LSA-R.S. 23:1021 as, "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration". Under the circumstances of this case, we find the trial court's ruling that an accident within the meaning of the Worker's Compensation Law, occurred to be correct.
An employee in a worker's compensation action has the burden of establishing a causal link between the accident and the subsequent disabling condition. Walton v. Normandy Village Homes Assn., Inc., 475 So.2d 320, 324 (La.1985); Peveto v. WHC Contractors, et al., 93-1402 (La. 1/14/94), 630 So.2d 689; Penny v. Avondale Container Service, 93-966 (La.App. 5 Cir. 3/29/94), 636 So.2d 980.
Defendant challenges the hearing officer's finding that the hearing loss was causally related to the work-related incident based on the lack of proof, by a medical certainty, that the hearing loss was causally related to the accident. This argument is based on the testimony of Dr. Ronald French, offered by way of deposition, who examined the claimant and opined that the hearing loss was a conductive loss caused by chronic ear infection, a hole in the ear drum or congenital deformity of the middle ear. Defendant maintains that there is no medical evidence to support a finding that there is a reasonable possibility of a causal connection between the work-related incident and the hearing disability.
Medical testimony was offered by way of depositions taken of Dr. Owens and Dr. French and admitted into evidence by stipulation of the parties. Dr. French was of the opinion that the hearing loss was conductive, the result of pre-existing condition and not causally related to the incident. Dr. Owens opined that there is a reasonable possibility that the incident caused the hearing loss.
*1228 Medical testimony, albeit significant, is not conclusive as to the issue of causation, which is generally the ultimate fact to be decided by the court after weighing all the evidence. Haughton v. Fireman's Fund American Ins. Co., 355 So.2d 927, 928 (La. 1978); Peveto, 630 So.2d at 691. In addition to the medical evidence, the claimant offered lay testimony to support his claim that his hearing was functional until the April 10, 1992 incident. From the reasons for judgment, it is clear that the hearing officer gave the testimony of the claimant's treating physician more weight. In that regard the hearing officer stated, in reasons for judgment:
.... Dr. French's opinion was that the claimant's hearing loss was largely conductive and a pre-existing condition. Dr. Owen's opinion is that the hearing loss is related to the incident that occurred on April 10, 1992.
. . . . .
The Court respects Dr. French's position, but he was not the treating physician. He only saw the claimant one time for an evaluation.
. . . . .
The Court has decided to accord greater weight to the treating physician, Dr. Owen's testimony and medicals.

. . . . .
The hearing officer also stated:
The issue concerning the pre-existing condition is rendered in favor of the claimant. In this case, based on the credible evidence, the claimant stated that he had had no prior ear problems. There was no medical to contradict this. There was testimony from two witnesses, who were related to the employer that they knew Mr. Wooley had hearing problems. Their testimony appeared not to be credible and it appeared to be self serving. The Court finds that prior to the accident, Mr. Wooley was functioning as a top notched (sic) carpenter. After the accident, he manifested a disabling condition. There is sufficient medical evidence to show that there is a reasonable possibility of causal connection between the accident and the disabling condition.
Even if the employee suffered from a pre-existing medical condition, he may still prevail if he proves that the accident "aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which compensation is claimed." Walton v. Normandy Village Homes Ass'n, Inc., supra at 324. There is a presumption to aid plaintiffs in cases involving a pre-existing condition recognized in Walton, supra. In that case the court stated:
[W]hen an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and the activation of the disabling condition, the employee's work injury is presumed to have aggravated, accelerated or combined with his preexisting disease or infirmity to produce his disability.
Id. at 324-25 (citing Hammond v. Fidelity & Casualty Co. of New York, 419 So.2d 829, 831-32 (La.1982); Haughton v. Fireman's Fund American Ins. Co., supra at 929 (La. 1978)).
The factual findings of the hearing officer are to be reviewed using the manifest error standard even when, as in the instant case, the evidence consists of documentary as well as live testimony. Picou v. Circle, Inc. 578 So.2d 1183 (La.App. 5 Cir.1991). Given the evidence contained in the record, this Court does not find reason to overturn the factual finding of the hearing officer that the April 10, 1992 incident and the claimant's hearing loss are causally related.
The defendant also challenges the finding by the hearing officer that the claimant was temporarily totally disabled as a result of the hearing impairment. Again defendant bases its argument on the testimony of Dr. French.
We do not address this assignment of error as written because we find an error of law in the hearing officer's ruling in this regard. While the causal link between an accident and the resulting injury may be *1229 established by a preponderance of the evidence, a showing that the claimant is temporarily totally disabled requires a higher standard of proof. To receive disability payments on a temporary total disability the claimant must satisfy the requirements of LSA-R.S. 23:1221(1). Tanner v. International Maintenance Corp., 602 So.2d 1133 (La.App. 1 Cir.1992). That statute, as amended in 1989, provides in pertinent part:
(1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment. (Emphasis added)
In her reasons for judgment the trial judge stated; "The Court finds that the law and evidence submitted by the claimant has proven by a preponderance of the evidence that he is disabled as a carpenter". By using a lesser standard of proof, the hearing officer committed legal error. This legal error constitutes reversible error and necessitates our review de novo of this matter. Tanner v. International Maintenance Corp., supra; Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). We must review the entire record to determine whether the claimant has shown by clear and convincing evidence that he is unable to engage in any employment or self-employment. LSA-R.S. 23:1221(1); Tanner v. International Maintenance Corp., supra.
Based on our review of the record, we find the claimant did meet that burden. The extent of the hearing loss is not in dispute. Both Drs. Owens and French acknowledge that the claimant has a significant hearing loss. Dr. Owens testified that he first examined Mr. Wooley on April 14, 1992. Mr. Wooley consulted Dr. Owens complaining of decreased hearing in his right ear and a ringing sound since being exposed to a stud gun noise on the previous Friday. The patient noted no previous hearing problems. Dr. Owens conducted an examination of the claimant's eyes, nose and throat, did a comprehensive audiogram and conducted a tympanogram, which is an efficiency-of-the-eardrum test. The results of the examination show, "left ear hearing loss of a mild degree in low tones and what's called a notched hearing loss or worsening or depression at 4.000 hertz and return closer to normal at 8,000". Dr. Owens stated those results indicated a noise-related hearing loss. The results of tests on the right ear indicate an even greater hearing loss, although the cause of that loss is not as obvious. Specifically, Dr. Owens stated that the hearing impairment in the left ear was mild to moderate with 25 to 30 decibels of hearing. In the right ear the impairment is greater than 75, which would be considered a severe hearing impairment. To put the hearing impairment in perspective, Dr. Owens explained that normal conversation level is between 60 and 65 decibels, so Mr. Wooley would not be able to hear normal conversation. A lawn mower is between 95 and 105 decibels. Dr. Owens' final diagnosis was noise trauma, although he could not determine if the source was entirely nerve hearing loss or nerve hearing loss with conductive hearing loss.
Dr. Owens stated that the claimant's hearing impairment was permanent in nature and surgical intervention would be of no help *1230 to the claimant. However, he may be improved with hearing aid therapy. Dr. Owens also stated that further noise exposure could result in further hearing loss and recommended that the claimant wear either earplugs or earmuffs to avoid the noise.
While he did not make a specific determination of whether Mr. Wooley could continue in his employment as a carpenter, the doctor did state that the claimant should not be exposed to any loud noise. Dr. Owens also stated that, "(t)he biggest problem would be communicating danger or instructions. He has hearing loss which would be compounded by muffs or plugs and further compounded by background noise. And it could be conceivable that even a loud warning or shout could not be heard in time as far as a dangerous situation at work".
Dr. Ronald French examined the claimant one time on November 19, 1992 at the request of the defense counsel. Dr. French confirms that the claimant has a severe hearing loss in the right ear and a moderate hearing loss in the left ear. He further states that the damage is permanent and likely to be progressive "if left unattended". Dr. French considered surgery a possible option and stated that the problem may be helped by a hearing aid. Although his diagnosis agrees with that of Dr. Owens, his opinion on disability differs. Dr. French opined that the claimant can continue to work as a carpenter despite his hearing loss.
We have reviewed the entire documentary evidence given by both doctors. With all due respect to Dr. French, we assign, as did the hearing officer, more weight to the opinion of the treating physician, Dr. Owens. Considering the medical testimony and the lay testimony of individuals working in the construction business as previously detailed in this opinion, we find that the claimant did show by clear and convincing evidence that he cannot function effectively and safely in his job as a manual laborer, and is entitled to temporary total disability.
In the next assignment defendant asserts that the claimant's weekly wages for the purpose of establishing the rate of compensation were incorrectly calculated by the hearing officer. As previously stated, the court found the weekly wage applicable by using an average work week of 37 hours based on the average time worked in the year prior to the accident. The trial court found that four weeks preceding the accident were unusual because of the illnesses in claimant's family. Defendant asserts the evidence shows Mr. Wooley was a part-time employee of E.J.D. Thus, defendant argues the rate should have been calculated using 14.75 average hours per week, reflecting the number of hours actually worked for the four weeks preceding the accident.
LSA-R.S. 23:1021(9) provides:
"Part-time employee" means an employee who as a condition of his hiring knowingly accepts employment that (a) customarily provides for less than forty hours per work week, and (b) that is classified by the employer as a part-time position.
LSA-R.S. 23:1021(10) provides:
"Wages" means average weekly wage at the time of the accident.
The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or
(ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident; or
(iii) If the employee is paid on an hourly basis and the employee is a part-time employee, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the injury.
In reasons for judgment the trial court stated:

*1231 It is true that the claimant worked less than forty hours per week before the accident. The claimant testified that normally he worked 40 hours per week. Unfortunately, there was a situation beyond his control. Both his father and his sister was (sic) ill. His sister died during this time period. The testimony and evidence established that the claimant worked approximately 40.4 hours per week for the employer in 1991. It is also established that in 1992, preceding the accident, the claimant averaged approximately 37 hours per week. It is the Court's finding that the claimant should be entitled to compensation calculated on the rate of Ten Dollars ($10.00) per hour for an average of 37 hours per week.
Joyce David, the officer manager of E.J.D., whose duties include bookkeeping, testified that Mr. Wooley was an independent contractor who did not work exclusively for E.J.D. He began working in late January, 1991 and continued through the accident in April, 1992. She did state, however, that claimant worked "pretty much full-time" from January 1, 1992 through March 3, 1992.
Records introduced in conjunction with that testimony show that Wooley worked consistently for E.J.D. from January 30, 1991 through March 3, 1992. After he began work with E.J.D. in 1991, he worked the entire year, with the exception of four weeks in March. For the 31 weeks claimant worked in 1991 he averaged about 40 hours per week. In 1992 for the first two months he averaged 48 hours per week. Claimant's work record in March, 1992 is sporadic. He did not work at all in the first week of March. In the remaining three weeks he worked 6, 46, and 7 hours respectively. He did not work in the first week of April and he worked 22 hours in the week he was injured.
E.J. David, Jr., president of E.J.D., testified that Wooley worked both for E.J.D. and himself during 1991 and 1992. Mr. David stated that Mr. Wooley would come to the office to receive his job assignment. If there was no work for him on any particular day, Mr. Wooley would go home and he would not be paid.
Given this evidence we do not find Mr. Wooley to be a part-time employee. He consistently worked more that 40 hours per week and there is no indication that he was classified by his employer as part-time. Further, although Mr. Wooley worked less in the four weeks preceding the accident due to the critical illnesses of his father and sister, we do no find that there is sufficient evidence to show that Mr. Wooley "regularly and at his own discretion, worked less than 40 hours per week", as envisioned by the statute. See Price v. Fireman's Fund Ins. Co., 502 So.2d 1078 (La.1987). Consequently, we find the wage rate should have been calculated as provided for in R.S. 23:1021(10)(a)(i). The trial judge erred in using 37 hours. The rate should be calculated by using a 40 hour work week multiplied by $10.00 per hour. In accordance with this finding we amend the rate of hourly wages for use in calculating compensation due pursuant to LSA-R.S. 23:1221 to $400.00.
The defendant also assigns error in the trial court finding that the defendant was arbitrary and capricious in failing to pay compensation and in awarding damages for that behavior. The hearing officer's finding was based on a finding of fact that such an award was warranted and that decision cannot be overturned absent a finding that it is clearly wrong. Baldwin v. Greater Lakeside Corp., 93-768, (La.App. 5 Cir. 1/25/94), 631 So.2d 1238. In the instant case, benefits were refused because a physician chosen by the defendant found no causal link between the accident and the injury. Taking into consideration the other evidence available, both medical and lay, we cannot find the ruling of the hearing officer clearly wrong.
The fifth assignment asserts the hearing officer erred in denying the Motion for New Trial and Motion for Disqualification for Fraud. It is well settled that an order which denies a new trial is generally a non-appealable judgment, reviewable only under supervisory jurisdiction for abuse of discretion. Miller v. Chicago Ins. Co., 320 So.2d 134 (La.1975); Chandler v. Grass, 600 So.2d 852 (La.App.3d. Cir.1992). Defendant's argument in support of the motion for new trial *1232 is essentially that claimant has secured work as a carpenter. This Court has no jurisdiction to review this non-appealable judgment on appeal. However, we note that defendant is not without recourse to bring this evidence to the trial court. Given the fact that the claimant was found to be temporarily disabled, the defendant has adequate opportunity to show, in the court below, that the disability no longer exists by methods provided for in LSA-R.S. 23:1221(1)(d) and 23:1310.8 B.
For the foregoing reasons the judgment of the trial court is amended to reflect that the weekly wage to be used in the calculation for benefits is $400.00. In all other respects the judgment is affirmed.
AFFIRMED.