707 So.2d 1277 (1998)
Melanie K. STARKMAN
v.
MUNHOLLAND UNITED METHODIST CHURCH.
No. 97-CA-661.
Court of Appeal of Louisiana, Fifth Circuit.
January 14, 1998.
*1278 David A. Dalia, New Orleans, for Plaintiff/Appellant.
Denis Paul Juge, Charles W. Farr, Metairie, for Defendant/Appellee.
Before WICKER, GOTHARD and DALEY, JJ.
DALEY, Judge.
This is an appeal from a judgment in a worker's compensation case in which the plaintiff-employee was denied compensation benefits. For reasons assigned, we affirm the judgment of the hearing officer.

FACTS:
The plaintiff, Melanie K. Starkman, was hired by the defendant, Munholland United Methodist Church, (hereinafter, Munholland) as Music Director in December 1992. Prior to her employment at Munholland, Ms. Starkman was in the military. She received an honorable medical discharge in 1982 due to a knee injury. From there she went to work at Kennedy Space Center. After being laid off from Kennedy Space Center, she obtained a Master's degree in church music from Scarritt Graduate School in 1988. She served as Music Director for a church in Missouri prior to her employment at Munholland.
As part of her job duties at Munholland, Ms. Starkman was required to direct both the bell choir and the chancel choir. During choir rehearsals she would demonstrate to the choir members how to sing and breathing techniques for singing. In order to maintain her singing voice, it was necessary for her to practice one hour each day. During her tenure at Munholland the chancel choir was invited to sing at Carnegie Hall under her direction.
On March 14, 1995, Ms. Starkman arrived at Munholland for a staff meeting. Upon arrival she noticed a very strong odor of pine scented Lysol. Lysol was being used in a room in the area to clean the toys and walls of the nursery. This concerned her because she had been diagnosed as having asthma as *1279 a child and also had an allergy to pine. She asked that the door remain open for the meeting and that the fan be turned on in order to help the odor dissipate. The meeting lasted approximately one and one-half hours. After the meeting she left the building for about one and one-half hours. Upon her return she continued to smell the Lysol. She left Munholland at about 4:00 p.m. at which time she noted difficulty breathing. Ms. Starkman used a bronchodilator and then took an antihistamine, falling asleep shortly afterward. The next morning, Ms. Starkman received a telephone call from a friend, Mrs. Catherine Black, who could barely understand Ms. Starkman's voice. Mrs. Black and her husband, Dr. Marcus Black, went to Ms. Starkman's home where they found Ms. Starkman's face to be swollen almost beyond recognition. Dr. Black administered a steroid medication to Ms. Starkman and remained with her for about thirty minutes until he felt it would be safe to leave her.
Ms. Starkman did not go to work at Munholland on March 15, 1995 during the day, however, she went to choir practice that evening. Ms. Starkman worked at Munholland on March 16 and 17, 1995.
On Saturday, March 18, 1995, Ms. Starkman was working at a garage sale at Munholland as part of her duties as Music Director. While at the garage sale, she noted the smell of pine scented Lysol and found that it was again being used to clean the nursery area. She immediately left the building. She returned to Munholland that night where she had to assist in preparing a meal for a visiting choir.
Following this second exposure, Ms. Starkman requested that she be notified before any chemicals were used in the Munholland building.
On April 4, 1995, Ms. Starkman was again exposed to pine Lysol fumes at Munholland. Upon smelling the Lysol, she immediately left the building.
Ms. Starkman continued to function as Music Director at Munholland until May 8, 1995 when she was fired. On September 19, 1995, Ms. Starkman filed a claim with the Office of Worker's Compensation alleging she was disabled as a result of these exposures to pine scented Lysol. This matter was tried on January 17, 1997, and after judgment was rendered in favor of Munholland, Ms. Starkman has appealed.
At trial Ms. Starkman testified that she had suffered from asthma as a child, but it had disappeared until the late 1980's. Prior to these Lysol exposures, she had only two or three exacerbations of her asthmatic condition. The exacerbation previous to the exposures was caused by cigarette smoke for which she sought treatment from Dr. Henry Jackson. Prior to the Lysol exposures Ms. Starkman was on minimal medications, however after the exposures she has had to be placed on numerous medications, including steroids. The Lysol exposures, she claims, left her with a chronic cough and shortness of breath. She alleges increased sensitivity to various odors and chemicals. Ms. Starkman testified as to several instances where she was in public, but had to leave due to certain odors which caused her to wheeze and have difficulty breathing. She testified that she only goes out of the house two or three times per week and that Dr. Glade, her current pulmonologist, told her she needed to be homebound except for trips to the store. She currently visits Dr. Glade on a monthly basis.
Ms. Starkman testified that the reaction she suffered following the first exposure to Lysol was the most severe because that exposure lasted some six to seven hours. Following that exposure she suffered burning in her respiratory tract and lungs in addition to difficulty breathing and severe facial swelling. After the second exposure she also suffered this same burning and difficulty breathing which required her to stop her car on the way home to use an inhalation bronchodilator. She did not seek medical treatment following the second exposure. Following the third exposure Ms. Starkman testified that she again experienced intense burning, difficulty breathing and shortness of breath. She was treated with steroids by Dr. Black following this exposure. Dr. Black suggested she contact the pulmonologist who had previously treated her asthma for treatment, Dr. Jackson.
*1280 Ms. Starkman characterized her asthma prior to the exposures as mild. However, following the exposures it has become severe. She explained that the chronic cough damaged her vocal cords and affected her singing voice. She testified that her singing voice now has a "breathy tone" which is not acceptable by any standards of choral repertoires.
Ms. Starkman explained that she continued to work as Music Director following these exposures because she had been told by her supervisor, the pastor of Munholland, Reverend Nick Evans, that she did not have any sick leave left as it had all been used following an earlier surgery. Ms. Starkman testified that she could not fully perform her duties as Music Director after these exposures, but she delegated certain functions to other choir members. Following her discharge from Munholland, Ms. Starkman testified that she thought her respiratory condition would improve and she would find another position as Music Director and would continue to work. When it became apparent that her condition was not going to improve, she filed a claim for worker's compensation benefits.
During cross-examination, Ms. Starkman explained that she had asthmatic bronchitis as a child which disappeared in her adolescent years. The asthma resurfaced in the late 1980's, but was mild. Prior to these recent exposures at Munholland she was on two asthma medications, however since these exposures she has been on oral steroids almost continually and must take numerous asthma medications. She explained that following these exposures she did conduct choir rehearsals, but they were not complete because of her inability to sing and demonstrate proper breathing techniques. Ms. Starkman testified that she is housebound except for occasional trips to the grocery store to obtain life-sustaining products, such as medication. She told of several experiences wherein she was in public, but suffered an asthma attack and was forced to return home after being exposed to various odors such as perfume, carpet adhesive, and fumes from chemical plants. On redirect, Ms. Starkman emphasized that prior to these exposures, she had mild asthma and that she did not have shortness of breath or chronic cough. Prior to these exposures she was sensitive to odors and perfumes, but they did not cause an asthma attack.
In the presentation of their case, Munholland called Ms. Merle Hilbun to the stand. Ms. Hilbun worked as the administrative assistant at Munholland during the time Ms. Starkman was exposed to Lysol. She recalled receiving a telephone call from Dr. Black on March 15, 1995, in which Dr. Black explained Ms. Starkman's reaction to Lysol. Ms. Hilbun told the director of the nursery program not to use pine scented Lysol any longer and to remove any remaining pine scented Lysol from the building. This was not reduced to writing. She explained that on the day of the garage sale Lysol was used by a teacher who was not present when Ms. Hilbun had explained Ms. Starkman's allergic reaction to the Lysol. Ms. Hilbun stated that the person using Lysol on April 4, 1995, was part of the cleaning staff who had not been told of Ms. Starkman's problem with Lysol. Ms. Hilbun testified that Ms. Starkman never told her she continued to have problems following the Lysol exposures. She noted that Ms. Starkman never missed a Sunday service or any rehearsals following these exposures. During Ms. Hilbun's testimony a telephone message was introduced dated April 24, 1995, which stated that Ms. Starkman had called to say she would not be coming to work because her knee was swollen and needed to be elevated. On cross-exam, Ms. Hilbun testified that she did not attend choir rehearsals and did not really know if Ms. Starkman was able to perform her duties as choir director following the exposures.
The next witness called by the defense was Mr. Julian St. Pierre, a private investigator, who conducted surveillance videos on Ms. Starkman during August 1996. A video was played during Mr. St. Pierre's testimony which showed Ms. Starkman going to the post office on three occasions. On another occasion, Ms. Starkman was seen going to eat lunch in a restaurant, going to a pharmacy and going to the post office. There also was one occasion in which Ms. Starkman went to the bank, the post office, and an insurance office, but did not exit her vehicle.
*1281 Mr. St. Pierre did not note any instances where it appeared Ms. Starkman had difficulty breathing.
In support of her case, the plaintiff submitted the medical records of Dr. Henry Jackson. These records contained a letter dated April 23, 1994, from Dr. Jackson addressed to Dr. Black reflecting a recent evaluation of Ms. Starkman. In this letter, Dr. Jackson states that Ms. Starkman had a history of "recurrent episodes of cough, wheeze and chest tightness since the age of about four." He goes on to state that there have been several incidences where she has required emergency room treatment. One week prior to his exam, she had a severe episode of asthma requiring an injection of steroids. It was Dr. Jackson's impression that Ms. Starkman had poorly controlled bronchial asthma. He suggested treatment with inhalation steroids and prescribed two such medications for her. The next time Dr. Jackson examined Ms. Starkman was after the Lysol exposures. The record for the June 7, 1995 visit states, "more asthma, bilateral wheezes." He added another medication to her regime. Dr. Jackson's last examination of Ms. Starkman was on June 21, 1995, in which Dr. Jackson noted complaints of wheezing. Two more medications were added to her treatment.
Plaintiffs also admitted the deposition and office notes of Dr. Black into evidence. Although Dr. Black's subspecialty is oncology, he is experienced treating patients with respiratory problems. Dr. Black explained that his wife had developed a close friendship with Ms. Starkman as a result of his wife's involvement with the choir. Following Ms. Starkman's termination from Munholland, the Black family opened their doors to Ms. Starkman and allowed her to move into their home. Dr. Black testified as to the condition he found Ms. Starkman in on March 15, 1995. His records describe severe facial swelling and difficulty breathing. He visited Ms. Starkman later that afternoon and noted that she had some residual facial swelling and complained of pain upon inhalation and exhalation. Ms. Starkman was placed on oral steroids. Dr. Black treated Ms. Starkman after her April 4, 1995 exposure, again prescribing oral steroids. The record from this visit reflects her difficulty breathing and facial swelling. At that point, Dr. Black called Munholland to request that Ms. Starkman not be exposed to this chemical and that she be given notice prior to utilization of these chemicals so she could avoid exposure to them. Dr. Black later treated Ms. Starkman for stress induced migraine headaches related to her termination from Munholland. Dr. Black explained that once an individual develops reactive airway disease, their airways become very sensitive, not only to that particular chemical, but to other stimuli as well. He gave several examples of instances wherein he was in public with Ms. Starkman and she developed coughing and shortness of breath after being exposed to various agents. Dr. Black feels that Ms. Starkman has a continuing impairment which renders her unable to perform the type of work she was doing prior to the exposures.
The plaintiff admitted the medical records and deposition of Dr. Leonard Glade into evidence. Dr. Glade's medical records were not legible to this Court. In his deposition, Dr. Glade testified that Ms. Starkman first visited him on July 31, 1995, complaining of a dry cough, which was worse at night. She complained of asthma which dated back to March 1995 exposures to pine Lysol. Dr. Glade had no knowledge of her symptoms prior to the exposures. It was his impression that Ms. Starkman had asthma and was being treated aggressively for this condition. Dr. Glade felt the appropriate course of action was to find out the cause of the cough. At the next visit on August 8, 1995, Dr. Glade decreased her oral steroid medication because she was having less cough. By September 9, 1995, he testified that she was no longer coughing, but she still required medication for asthma. The coughing returned in November 1995. Dr. Glade attributed the coughing to her continued asthmatic condition. He explained that he has not spent much time studying how the exposures have affected her present condition. He noted that Ms. Starkman had remarked that the exposures resulted in a change in her condition, but he did not have data to support this contention. Dr. Glade later explained that the exposure may have caused a permanent change in her symptoms, however the only way to prove that a change in her symptoms occurred would have been to compare *1282 pulmonary function studies performed just prior to the exposures with pulmonary function studies performed after the exposures. He did note that her medical records show that she was active until the exposures, but since the exposures she has been only minimally functional. The fact that she had few visits with physicians prior to the exposures and that she currently has to visit him at least monthly indicates that the exposures were the events that worsened her condition. He opined that the exposures aggravated her condition, but did not know whether they had any permanent effects on her condition. Dr. Glade felt that Ms. Starkman could not hold a job because she is currently housebound in order to decrease her exposure to the outside environment. He testified that Ms. Starkman only leaves the house for things needed for survival. Dr. Glade testified that Ms. Starkman would have difficulty with sustained singing.
The plaintiff submitted into evidence medical record relating to surgical procedures which she underwent prior to and subsequent to the Lysol exposures. These medical records indicate that prior to the exposures Ms. Starkman did not require respiratory therapy following surgery. However, subsequent to the exposures, she required respiratory therapy after both surgical procedures. In fact, following her hysterectomy in September 1996, Ms. Starkman had to remain in the hospital for two days solely for observation of her pulmonary status.
Also, admitted into evidence by the plaintiff were documents from the National Institutes of Health regarding the diagnosis and management of asthma.
In support of their position, the defendants submitted into evidence the deposition and medical records of Dr. Robert Jones. Dr. Jones has been a pulmonologist since 1974 and currently practices and teaches at Tulane Medical Center. He frequently performs independent medical examinations estimating that eighty to ninety of the requests for these exams are made by the defendant in various cases. He related Ms. Starkman's medical history which was essentially the same as her testimony. His examination revealed that her vital signs were normal and her chest was clear. She did not have a cough. The results of pulmonary function tests were consistent with normal ventilatory function. As part of his evaluation, Dr. Jones reviewed the medical records of Drs. Glade, Black, and Jackson. He noted that there was no indication that Dr. Glade had ever treated Ms. Starkman for an acute asthma attack and that there was no objective evidence that Ms. Starkman had severe or incapacitating asthma. Dr. Jones felt that some of the medications being taken by Ms. Starkman could have adverse effects on her asthma. He opined that the effects of the Lysol were temporary and there was no evidence that her asthma remained worse after her recovery from that exposure. He did not feel that the increases in her medications were a result of the Lysol exposure. He did not agree that Ms. Starkman should remain housebound. Dr. Jones did not feel that Ms. Starkman's asthma would have an adverse effect on her employability, although he admitted on cross-examination that he was not aware of the duties of a music director in their entirety.
The defendants also submitted a medical report from an allergist, Dr. Rolston, who treated Ms. Starkman on one occasion in June 1993. The history taken by Dr. Rolston states that Ms. Starkman had "much asthmatic bronchitis in the past," a cough which increased at night and with exertion, occasional tight chest, shortness of breath and "nasal symptoms."
Finally, the defendants submitted a report from Dr. R. Joseph Tamimie, a specialist in occupational medicine, who examined Ms. Starkman at the request of the Office of Worker's Compensation. Dr. Tamimie also had pulmonary functions tests performed on Ms. Starkman and he interpreted these tests as consistent with her history of asthma. Following his review of the medical records and the results of his evaluation, Dr. Jones concluded:
... it is my opinion that this patient has had chronic recurrent asthma that was aggravated by her exposure to Pine Sol [sic pine Lysol] at work in March of 1995, and on two subsequent occasions. It is clear that this patient had a significant medical history of asthma prior to her *1283 exposure at work, and that this exposure did not cause her asthma. Since she also had a history of significant hypersensitivity reactions, her exposure at work would not be the cause for all subsequent hypersensitivity reactions other than if she had a reaction with recurrent exposure to Pine Sol. Therefore, her exposure to this odor caused a significant allergic asthmatic reaction that resolved gradually with medication. Once her exposure ceased, and her symptoms from that exposure resolved, all other subsequent asthmatic reactions should not be attributed to that exposure.
Dr. Tamimie went on to express the opinion that Ms. Starkman should be able to resume her work as a choir director providing there is no further exposure to Pine Sol.
Following a one day trial the trial judge held that Ms. Starkman was not entitled to workers' compensation benefits and dismissed her claim with prejudice at her costs. In her reasons for judgment, the trial judge found that despite restrictions to remain housebound, Ms. Starkman was observed on numerous occasions carrying on a normal schedule, including going shopping, to the post office and out to a restaurant. The reasons go on to state that Ms. Starkman's testimony lacked credibility, offering only the testimony of Dr. Black, with whom she lives to corroborate her claim. It was held that she "under-reported her activities and prior medical history while over-reporting her maladies." In sum, the trial court held that she failed to meet her burden of proving by a preponderance of the evidence that she was disabled as a result of her exposures to pine scented Lysol.
On appeal plaintiff argues that the trial judge erred in her holding claiming that the evidence and testimony do not support her judgment and reasons for judgment. She argues that she was able to sing and perform her duties prior to these exposures and has been unable to sing and perform her duties after the exposures. She contends that the workers' compensation law should be liberally construed in her favor finding that she was disabled as a result of these exposures. The plaintiff also argues that the trial judge committed manifest error in placing more weight on the testimony of the two physicians who examined Ms. Starkman on only one occasion and by not putting any weight on the testimony of her two treating physicians, Drs. Glade and Black. Plaintiff also contends that the testimony, records and reports by Drs. Jones was incomplete in that he did not have plaintiff's most recent medical records which included the pulmonary function studies performed at Dr. Glade's request in July 1996. She contends that the history contained in Dr. Tamimie's report is inaccurate. Finally, plaintiff argues that the trial judge erred by refusing to admit pertinent testimony and updated medical evidence.
In response the defendants argue that the plaintiff did not file a claim for workers' compensation benefits until after she was fired from Munholland. They also note that she did not seek treatment for asthma from a pulmonologist until June 7, 1995. The defendants point out that the physical exams and pulmonary function tests performed by both Dr. Jones and Dr. Tamimie were normal. They argue that both of these physicians opined that the Lysol exposures caused temporary symptoms which dissipated and that her continuing problems cannot be attributed to these exposures. Finally, they point out that unless the hearing officer committed manifest error, her factual findings must be affirmed on appeal.

ANALYSIS:
It is well settled that for an employee to recover benefits under the Louisiana worker's compensation law, the employee must carry the burden of proving by a preponderance of the evidence that an accident occurred in the course and scope of his employment, that the accident caused his injury, and that the injury caused his disability. Gonzales v. Babco Farm, Inc., 535 So.2d 822 (La.App. 2nd Cir., 1988); Ewell v. Schwegmann Giant Super Markets, 499 So.2d 1192 (La.App. 5th Cir., 1986). The plaintiff-employee must prove by a preponderance of the evidence the causal relationship between his disability and the accident. Ewell, id. Although the worker's compensation rules are construed liberally in favor of the claimant, the employee still must carry the burden of proving by a preponderance of the evidence that the injury caused his disability. See Lee *1284 v. Union Carbide Corp. 506 So.2d 204 (La. App. 5th Cir., 1987).
Prior to trial, the parties in this case stipulated that Ms. Starkman was exposed to pine scented Lysol fumes on March 14, 1995, March 18, 1995, and April 4, 1995 during the course and arising out of her employment with Munholland. The medical records and testimony are clear that these exposures caused an aggravation of Ms. Starkman's asthmatic condition. Thus, the trial judge correctly determined that the only issue in this case is whether Ms. Starkman is disabled as a result of these exposures.
The trial court must examine the totality of the evidence, both medical and lay, in making its determination of whether to grant an award for disability. Simpson v. S.S. Kresge Co., 389 So.2d 65 (La.1980); Ewell, supra. While this court is aware of the generally accepted principal that the opinion of a treating physician is to be given more weight than the opinions of those physicians retained for trial purposes only, we note that a treating physician's testimony must be weighed in light of other credible evidence. Latiolais v. Jernigan Bros., Inc., 520 So.2d 1126, (La.App. 3rd Cir., 1987). A court is not bound to blindly give credence to the treating physician's opinion solely because he is the plaintiff's treating physician. Id. It is the trial court's function to determine the weight to be accorded the medical and lay testimony. Ewell, supra. This factual determination should not be disturbed on appellate review unless it is clearly wrong and the trial judge has committed manifest error. Id. The manifest rule extends to credibility determinations based upon conflicting medical testimony. Latiolais, supra.
The plaintiff and Dr. Black testified as to Ms. Starkman's continuing disability which they felt to be permanent. While Dr. Glade testified that Ms. Starkman is unable to hold a job at the present time due to her inability to tolerate certain odors, he did not know whether condition was permanent. Moreover, Dr. Glade's testimony was unclear as to whether Ms. Starkman's present condition was caused by the Lysol exposures. On the other hand, the testimony of Dr. Jones was clear in stating that the Lysol exposures caused no permanent injury to Ms. Starkman and that Ms. Starkman was capable of working. Dr. Tamimie's opinion was clear that the Lysol exposures are not the cause of all subsequent hypersensitivity reactions experienced by Ms. Starkman and that Ms. Starkman was able to resume her duties as a choir director. From the totality of the evidence presented, the hearing officer could have reasonably concluded that the plaintiff was not disabled as a result of the Lysol exposures. We decline to second-guess the hearing officer's conclusion that plaintiff is not disabled as a result of the Lysol exposures.
Appellant contends that the trial judge erred in refusing to allow Mrs. Catherine Black to testify during the presentation of her case. In not allowing this witness to testify, the trial judge relied on Hearing Rule 2157C(5) which provides that each party shall file a pretrial statement with the appropriate district office seven days prior to the pretrial conference which shall set forth a list of witnesses each party may call and a short statement as to the nature of their testimony. No other witnesses may be called to testify except for good cause shown. The rule goes on to state that this requirement shall not apply to impeachment and rebuttal witnesses. As of the morning of trial the plaintiff's pretrial statement had not been filed. Accordingly, the trial judge was within her discretion refusing to allow Mrs. Black to testify.
Appellant contends that the trial judge erred in allowing the surveillance videotape into evidence because he had not been allowed to view it. We note that Hearing Rule 2157C(5) does not apply to this videotape because it was offered as impeachment evidence.
Finally, appellant argues that the trial judge erred in not allowing the record to be held open so he could submit the most recent medical records of Dr. Glade regarding plaintiff's condition which included Ms. Starkman's pulmonary function tests performed in July 1996. In the refusal to hold the record open for submission of these records, the trial judge stated that plaintiff's counsel had only begun actively seeking the pertinent record "this week." She noted that *1285 the trial had been set since December 6, 1995 and was tried on January 17, 1997, allowing ample time to obtain these records. We note that Hearing Officer Rule 2159 provides that all documents and evidence shall be introduced on or prior to the day of trial. Thus, it was within the discretion of the trial judge to refuse to hold the record open for submission of this evidence. We also find that the pulmonary function testing contained in these records, which plaintiff claims reveals a decrease in function, were performed in July 1996. The pulmonary function tests performed at the request of Dr. Jones in September 1996 were reported as normal. The pulmonary function tests performed at the request of Dr. Tamimie in December 1996 were also reported as normal. Hence, it is unlikely that the July 1996 pulmonary function tests would have made any difference in the trial judge's ruling.
For the foregoing reasons, the judgment of the Worker's Compensation court is affirmed.
AFFIRMED.